**FRIENDS OF THE EARTH, INCORPORATED; Citizens Local Environmental Action Network, Incorporated, Plaintiffs–Appellants,**

v.

**GASTON COPPER RECYCLING CORPORATION, Defendant– Appellee.**

No. 98–1938.

United States Court of Appeals, Fourth Circuit.

Argued March 1, 1999.

Decided June 2, 1999.

**ARGUED:** Bruce J. Terris, Terris, Pravlik & Millian, L.L.P., Washington, D.C., for Appellants. Harold Weinberg Jacobs, Nexsen, Pruet, Jacobs & Pollard, L.L.P., Columbia, South Carolina, for Appellee. **ON BRIEF:** Kathleen L. Millian, Terris, Pravlik & Millian, L.L.P., Washington, D.C.; Robert Guild, Columbia, South Carolina, for Appellants.

Before WILKINSON, Chief Judge, and HAMILTON and WILLIAMS, Circuit Judges.

Affirmed by published opinion. Judge HAMILTON wrote the majority opinion, in which Judge WILLIAMS joined. Chief Judge WILKINSON wrote a dissenting opinion.

## OPINION

HAMILTON, Circuit Judge:

Friends of the Earth, Inc. (FOE) and Citizens Local Environmental Action Network, Inc. (CLEAN) brought this citizens suit against Gaston Copper Recycling Corporation (Gaston Copper) pursuant to

§ 505 of the Federal Water Pollution Control Act, *see* 33 U.S.C. § 1365, alleging that Gaston Copper committed various violations of a March 1, 1991 permit issued to Gaston Copper by the South Carolina Department of Health and Environmental Control (DHEC). In the citizens suit, FOE and CLEAN sought civil penalties, declaratory and injunctive relief, as well as attorneys' fees, expert witness fees, and costs. Following a bench trial, the district court dismissed the citizens suit for lack of subject matter jurisdiction, concluding that FOE and CLEAN lacked standing. For the reasons stated herein, we affirm the district court's dismissal for lack of subject matter jurisdiction.

# I

## A

Congress enacted the Federal Water Pollution Control Act (Clean Water Act or CWA), *see* 33 U.S.C. §§ 1251–1376, to restore and maintain the "chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C § 1251(a). To this end, the CWA prohibits the discharge of pollutants into navigable waters without a permit. *See* 33 U.S.C. §§ 1311(a), 1362(12)(A). Permits "place limitations on the amount of effluent (pollution) corporations may discharge into the water, and require permit-holders to monitor their effluent discharges, to file test results and other data with the Environmental Protection Agency, and to cooperate with state agencies by placing information on Discharge Monitoring Reports (DMR's)." *Public Interest Research Group v. Magnesium Elektron, Inc.,* 123 F.3d 111, 115 (3d Cir.1997); *see also* 40 C.F.R. §§ 122.41(j), 122.48. If a permit holder fails to comply with any condition of its permit, the permit holder violates the CWA. *See id.* The Environmental Protection Agency (EPA)and state agencies, or citizens may bring suits against those who violate permits. *See* 33 U.S.C. § 1365; *see also Magnesium,* 123 F.3d at 114. In a citizens suit, citizens may request civil penalties, declaratory and injunctive relief, as well as costs of litigation, "including reasonable attorney and expert witness fees." 33 U.S.C. § 1365.

## B

Gaston Copper "owns and operates a non-ferrous metals smelting facility located in Gaston, Lexington County, South Carolina." (J.A.70). The smelting facility (Facility) sits on Lake Watson, a fourteen million gallon lake that is wholly contained, except for overflow.[1] When Gaston Copper purchased its smelting facility in 1990, the Facility was covered by a National Pollutant Discharge Elimination System (NPDES) Permit issued by DHEC. Of relevance, on February 13, 1991, DHEC reissued the permit for the Facility, with an effective date of March 1, 1991 (March 1, 1991 Permit). The March 1, 1991 Permit required contaminated storm water to be treated prior to discharge into Lake Watson; authorized the discharge of limited quantities of effluents, including biochemical oxygen demand, cadmium, copper, lead, zinc, and pH, after treatment from the Facility into Lake Watson; contained a schedule for compliance with the effluent limitations; and required monitoring and reporting for the effluent discharges.

## C

On September 14, 1991, FOE and CLEAN, two non-profit environmental organizations dedicated to protecting and improving water quality, brought, on their own behalf and on behalf of their members, this citizens suit against Gaston Copper in the United States District Court for the District of South Carolina pursuant to the citizens suit provision of the CWA, *see* 33 U.S.C. § 1365, alleging that Gaston

---

**1.** The parties stipulated that Lake Watson flows into the Boggy Branch, "a tributary of Bull Swamp Creek, which flows into the North Fork of the Edisto River." (J.A. 70).

Copper violated its March 1, 1991 Permit. The citizens suit sought civil penalties, declaratory and injunctive relief, as well as attorneys' fees, expert witness fees, and costs. According to FOE and CLEAN, Gaston Copper had violated and continued to violate its March 1, 1991 Permit by exceeding the effluent limitations for certain pollutants, by failing to comply with certain monitoring and reporting requirements, and by failing to comply with the schedule of compliance with respect to the effluent limitations.

FOE and CLEAN averred that Gaston Copper's March 1, 1991 Permit violations affected their "ability to protect and improve the waters of South Carolina" and also affected the "health, economic, recreational, aesthetic and environmental interests" of their members, who "reside in the vicinity of, or own property [near,] or recreate in ... the waters of the Boggy Branch of Bull Swamp Creek, the North Fork of the Edisto River, and tidally related waters affected by the [F]acility's discharge of pollutants." (J.A. 21, 23). Further, FOE and CLEAN claimed that Gaston Copper's failure to monitor and report in violation of its March 1, 1991 Permit "interfere[d] with efforts of [FOE and CLEAN's] members to protect their health, economic, recreational, aesthetic and environmental interests by interfering with their ability to take action on their own behalf." (J.A. 21–22, 23).

Gaston Copper moved to dismiss the case on, inter alia, the ground that FOE and CLEAN lacked standing to bring the suit, and the district court denied the motion. Thereafter, FOE and CLEAN moved for summary judgment on their claim that Gaston Copper had violated its March 1, 1991 Permit. The district court denied the motion, and the case proceeded to a bench trial on FOE and CLEAN's CWA claims. At trial, FOE and CLEAN presented evidence in support of their position that they had standing and also in support of their claims that Gaston Copper violated its March 1, 1991 Permit. Of relevance, FOE and CLEAN claimed that they had representational standing because their members suffered "injuries in fact" to protected interests in allegedly affected waterways, and that such injuries were "fairly traceable" to Gaston Copper's alleged violations of its March 1, 1991 Permit.

Specifically, in support of their claim that their members suffered injury in fact, FOE and CLEAN presented the testimony of three members asserting that they each had a legally protected interest in the waterways that were allegedly harmed by Gaston Copper's alleged violations of its March 1, 1991 Permit. First, Wilson Otto Shealy, a member of CLEAN, testified that he lives four miles downstream from the Facility and that his property includes a sixty-seven acre lake, in which he and his family fish and swim.[2] Next, Guy Jones, a member of FOE and CLEAN and owner/president of a canoe company, testified that he guides trips on the Edisto River. Last, William McCullough, Jr., a member of FOE, testified that he scuba dives in the Edisto River.

According to these members' testimony, their protected recreational and economic interests in the waterways that they used were injured in fact by Gaston Copper's alleged March 1, 1991 Permit violations. For example, Shealy testified that he believed that his lake contained mercury because he read an article in the local newspaper that all the lakes in his county, Lexington County, contained mercury. Shealy also testified that his concern that his lake contained effluents discharged by Gaston Copper in violation of its March 1, 1991 Permit stemmed from the fact that DHEC tested his lake prior to the time period relevant to this suit, and determined that there were effluents in his

---

2. According to Shealy, the source of his lake is Bull Swamp Creek and several other tributaries, including Boggy Branch, but there are thirty-one ponds between Bull Swamp Creek and his lake.

lake.[3] Shealy further testified that because of his concern that Gaston Copper is discharging pollution, he only eats the fish he catches from his lake "on occasion," and he only allows his grandchildren to swim in the summer once per day. (J.A. 76). Also, according to Shealy, his property value has diminished because of Gaston Copper's alleged discharges, and he knows his property value has diminished because he has "had people [right outside the court house] ... refer to [his] place as the polluted pond." (J.A. 79).

Next, Jones testified that he was concerned that the Edisto River contained effluents discharged by Gaston Copper and from other nonpoint sources such as fields and urban areas. Jones testified that his concern that Gaston Copper and other sources are polluting the Edisto River affects his enjoyment of canoeing and swimming because he has "greater confidence in [his company's] ability to market [its] trips to the general public when [the company is] taking people into an area that [it knows its customers] are going to have a quality experience and that [its customers'] health is going to be not threatened by the quality of water." (J.A. 131).

Last, McCullough testified that he was "concerned about all waters in South Carolina that [he] dive[s] having contaminants, especially heavy metals, [and] pesticide runoff." (J.A. 144). According to McCullough, "[I]f he knew that the water contained contaminants, he would be 'less likely to dive in it.'" (J.A. 145).[4]

To demonstrate that their members' protected recreational and economic interests in waterways that they used were injured in fact, FOE and CLEAN also relied on the testimony of their expert, Dr. Bruce Bell, and two studies performed by Gaston Copper. Dr. Bell testified that while Gaston Copper's March 1, 1991 Permit did not contain toxicity limits, it did contain water quality limits, and also required Gaston Copper to monitor its toxicity by performing whole effluent toxicity tests.[5] According to Dr. Bell, in some months from 1991–1995, Gaston Copper's laboratory toxicity tests revealed that the effluents had "observable effects" on the test organism. (J.A. 179). Dr. Bell, however, was unable to relate the toxicity tests to the alleged March 1, 1991 Permit water quality effluent limit violations.

The two studies performed by Gaston Copper for DHEC and relied upon by FOE and CLEAN, the 1993 and 1994 "Water Quality Stud[ies] to Evaluate the Fish Tissue, the Macroinvertebrate Community and Sediments at Gaston Copper Recycling Corporation," evaluated the concentration of certain effluents in fish tissue in Lake Watson; assessed the quality of the macroinvertebrate community in Lake Watson, Boggy Branch, and Bull Swamp Creek; and determined the concentrations of certain effluents in the sediments of Lake Watson, Boggy Branch, and Bull Swamp Creek. (J.A. 942–967, 968–991). First, the studies revealed "concentrations of certain heavy metals ... in fish tissue from Lake Watson," (J.A. 943); however, no fish studies were performed on fish in Boggy Branch or Bull Swamp Creek. Second, both studies concluded that there had not been any "apparent degradation of the macroinvertebrate community due to the effluent discharge of Gaston Copper Recycling Corporation to Lake Watson."

3. Shealy admitted, however, that his lake had not been tested since the DHEC testing, performed in 1990. This action arises out of Gaston Copper's conduct since 1991.

4. The members also testified that they relied on DHEC reports to know whether Gaston Copper was discharging effluents in violation of its March 1, 1991 Permit, and therefore were injured by Gaston Copper's failure to monitor and report some of its effluent discharges, as required by the March 1, 1991 Permit.

5. According to Dr. Bell, toxicity limits are the limits achievable with technology, and water quality limits are the limits of effluents that the permit holder may discharge into a waterway without violating EPA standards.

(J.A. 943, 971). Finally, while the studies "reflected detectable quantities of copper, lead, mercury ... in Lake Watson," (J.A. 944, 972), the studies indicated that only lead and copper were at detectable concentrations in the sediment of Boggy Branch and Bull Swamp Creek, and these concentrations were less than previous years, and "similar to values seen throughout South Carolina." (J.A. 944, 960, 972, 990).

Next, in support of their claim that their members' injuries in fact were fairly traceable to Gaston Copper's conduct, FOE and CLEAN's theory was that because Gaston Copper discharged harmful effluents into waterways upstream from the waterways in which Shealy, Jones, and McCullough had protected interests, the injuries to these members' protected interests were fairly traceable to Gaston Copper's discharges. In support of their theory, FOE and CLEAN presented evidence that during a 1990 public hearing for comment on the issuance of Gaston Copper's March 1, 1991 Permit, the DHEC hearing officer stated that runoff flows from Lake Watson to Boggy Branch, to Bull Swamp Creek, and to the Edisto River. The 1990 DHEC statement formed the basis of the parties' stipulation that Lake Watson flows into the Boggy Branch, "a tributary of Bull Swamp Creek, which flows into the North Fork of the Edisto River." (J.A. 70). Essentially, based upon this stipulation, FOE and CLEAN argued that the effluents that Gaston Copper discharged, allegedly in violation of its March 1, 1991 Permit, flowed downstream and adversely affected their members' protected recreational and economic interests.

At the conclusion of the bench trial, the district court determined that FOE and CLEAN failed to establish standing in their own right or representational standing to bring their claim representing the interests of their members. Of relevance, the district court noted that FOE and CLEAN failed to present evidence that the types of effluents discharged by Gaston Copper affected the waterways used by the members who testified. Further, the district court determined that the testimony of Shealy, Jones, and McCullough that they were concerned that Gaston Copper violated its March 1, 1991 Permit, did not, standing alone, establish that the waterways that they used were adversely affected. Thus, the district court determined that FOE and CLEAN failed to establish that any of their members suffered an injury in fact that was fairly traceable to Gaston Copper's alleged permit violations, and, therefore, dismissed their action for lack of jurisdiction. FOE and CLEAN noted a timely appeal.

## II

### A

On appeal, FOE and CLEAN contend that the district court erred in dismissing their CWA citizens suit against Gaston Copper for alleged violations of its March 1, 1991 Permit for lack of standing. Specifically, FOE and CLEAN claim they established that their members suffered injuries in fact that were fairly traceable to Gaston Copper's conduct. We review a district court's dismissal of a case for lack of standing *de novo*. *See Marshall v. Meadows*, 105 F.3d 904, 905–06 (4th Cir. 1997).

The United States Constitution provides that "'[t]he judicial Power of the federal courts of the United States extends only to specified 'Cases' and 'Controversies.'" *Friends of the Earth v. Laidlaw Envtl. Servs.*, 149 F.3d 303, 306 (4th Cir.1998) (quoting U.S. Const. art. III, § 2, cl. 1). "The doctrine of standing has always been an essential component of [the] case or controversy requirement of federal jurisdiction." *Marshall*, 105 F.3d at 906.

An association, such as FOE or CLEAN, "may have standing to sue in federal courts based either on an injury to the organization in its own right, or as the representative of its members who have been harmed." *Natural Resources De-*

*fense Council, Inc. v. Watkins,* 954 F.2d 974, 978 (4th Cir.1992). On appeal, FOE and CLEAN contend that they have representational standing. In order for FOE and CLEAN to have representational standing, they must establish that "(1) [their] own members would have standing to sue in their own rights; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief sought requires the participation of individual members in the lawsuit." *Id.*

Gaston Copper asserts that FOE and CLEAN have not established the first prong of representational standing: that their members would have an individual right to sue under the CWA for alleged violations of Gaston Copper's March 1, 1991 Permit. The Supreme Court has set forth the requirements for individual standing. *See Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). The Supreme Court has stated:

> [A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to "show [1] that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," and [2] that the injury "fairly can be traced to the challenged action" and [3] "is likely to be redressed by a favorable decision."

*Id.* (internal citations omitted).

B

■ We now turn to the first requirement: injury in fact. For injury in fact, the injury must be "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal citations, footnote, and quotations omitted). The Supreme Court has recognized that invasions of economic interests may constitute injury in fact. *See Bennett v. Spear,* 520 U.S. 154, 160, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). Additionally, this circuit recognizes that invasions of aesthetic and environmental interests may constitute injury in fact. *See Sierra Club v. Simkins Indus., Inc.,* 847 F.2d 1109, 1113 (4th Cir.1988). Thus, for example, we have found standing when a member of an organization has established that his interest in using or recreating in an area is adversely affected by pollution that is fairly traceable to the defendant. *See, e.g., Watkins,* 954 F.2d at 980 (holding that organization whose members recreated on affected waters and noticed effects of pollution had standing if discharge in violation of permit contributed to pollution of affected waters, thereby interfering with recreational use).

■ In this case, FOE and CLEAN failed to establish injury in fact. While we recognize that Shealy and McCullough's recreational interests and Jones' economic interest are legally protected interests, we conclude that the evidence failed to establish that the waters in which Shealy, Jones, and McCullough recreated or used were actually, or in imminent threat of being, adversely affected by pollution. *See Lujan,* 504 U.S. at 560, 112 S.Ct. 2130; *Watkins,* 954 F.2d at 979–80 (finding plaintiffs' affidavits, which stated, "While boating, swimming, and fishing, I noticed that, although there is an abundance of aquatic life upstream from the Site, the River downstream from the Site appears to be comparatively barren and sterile," and "When boating, I have noticed that the Savannah River downstream of the Savannah River Site has an unpleasant color and smell, which is different from the color and smell of the River upstream of the Site," sufficient to confer standing if plaintiffs could show pollution from defendant "in publicly accessible portions of the Savannah River basin"). In this case, no evidence was presented that established that Shealy's lake or the portions of the Edisto

River that Jones and McCullough used were in fact adversely affected by pollution, let alone by Gaston Copper's conduct. Indeed, there were no toxicity tests, or tests or studies of any kind, performed on waters from Shealy's lake or the portions of the Edisto River that Jones and McCullough used. Further, none of the members even testified that there was an observable negative impact on the waters that they used or the surrounding ecosystem of such water. Their concerns were based on mere speculation as to the presence of pollution without any evidence to support their fears or establish the presence of pollutants in the allegedly affected waters.[6]

To be sure, to establish injury in fact, FOE and CLEAN rely on the testimony of Shealy, Jones, and McCullough. However, this testimony falls well short of the water line for injury in fact. Shealy, Jones, and McCullough merely testified that they were concerned that Gaston Copper's conduct had resulted in pollution of water in which Shealy and McCullough recreated and of the water in which Jones' company used. Obviously, the three members' "concerns," without some evidence concerning an observable negative impact on the waterways in which the members recreated or used, is not enough to establish that the waterways in which the members recreated or used, were in fact adversely affected by pollution. In sum, there was simply no evidence that the waterways in which the members each had a legally protected interest were adversely affected; the members' concerns, standing alone, simply fail to establish that their legally protected interests were actually, or imminently threatened of being, adversely affected. *See Magnesium*, 123 F.3d at 123 (finding plaintiffs lacked standing when plaintiffs alleged that they had reduced their recreation in waterways because of concern of pollution, but plaintiffs failed to establish that defendant's admitted violations of permit's effluent standards harmed the waterway or posed a threat to the waterway); *Simkins*, 847 F.2d at 1112 n. 3 (finding standing when member's affidavit stated, "My [recreational] activities and interests with respect to the Patapsco River have been adversely affected physically, aesthetically and emotionally by [the defendant's] failure to comply with its NPDES permit and resulting [odorous and unsightly] illegal pollution.").

## C

█ Even assuming *arguendo* that FOE and CLEAN established that their members suffered injuries in fact, *e.g.* that the waterways in which Shealy and McCullough recreated and which Jones used were adversely affected, we conclude that

---

**6.** In concluding that Shealy's legally protected interests were actually, or in imminent threat of being, injured, the dissent relies heavily on the fact that Gaston Copper is "fouling" Lake Watson in that some of Gaston Copper's laboratory toxicity tests showed that Gaston Copper's effluents from Lake Watson affected test organisms; DHEC stated that "runoff" from Gaston Copper reaches the Edisto River; and DHEC tested Shealy's lake prior to the time relevant to this action and found pollutants in his lake.

We fail to see how the evidence relied upon by the dissent demonstrates that Shealy's interests in his lake were actually, or in imminent threat of being, injured. The fact that Gaston Copper is "fouling" Lake Watson simply does not establish that Shealy's lake is actually, or in imminent threat of being, injured. This is true even though DHEC stated that "runoff" flowed from Boggy Branch to Bull Swamp Creek and into the Edisto River. DHEC's statement simply does not establish that pollutants actually reached, or will imminently reach, Shealy's lake. Further, the fact that DHEC tested Shealy's lake in 1990 and found pollutants in the lake does not establish that Shealy's interests in his lake were actually, or in imminent threat of being, injured. The dissent again relies on the stipulation that water flows from Boggy Branch to Bull Swamp Creek and into the Edisto River. However, no evidence was admitted that the pollutants found in Shealy's lake by DHEC in 1990 were traceable to Gaston Copper's predecessor. Thus, the DHEC 1990 test does not suggest, nor let alone prove, that Gaston Copper's discharges after 1991 actually injured, or will imminently injure, Shealy's lake.

FOE and CLEAN failed to establish that the alleged injuries in fact were fairly traceable to Gaston Copper's conduct. In other words, FOE and CLEAN did not show that the waterways in which Shealy and McCullough recreated and which Jones used contained effluents of the type discharged by Gaston Copper, allegedly in violation of its March 1, 1991 Permit.

 "The requirement that plaintiff's injuries be 'fairly traceable' to the defendant's conduct does not mean that plaintiffs must show to a scientific certainty that defendant's effluent, and defendant's effluent alone caused the precise harm suffered by the plaintiffs." *Watkins,* 954 F.2d at 980 n. 7 (quoting *Public Interest Research Group, Inc. v. Powell Duffryn Terminals, Inc.,* 913 F.2d 64, 72 (3rd Cir. 1990)). The fairly traceable requirement does, however, require the plaintiff to show that there is a "substantial likelihood" that the defendant's conduct caused the plaintiff's harm. *Watkins,* 954 F.2d at 983; *Powell Duffryn,* 913 F.2d at 72. Three requirements are necessary to establish that there is a substantial likelihood that the defendant's conduct caused the plaintiff's harm:

> In a Clean Water Act case, this likelihood may be established by showing that a defendant had (1) discharged some pollutant in concentrations greater than allowed by its permit (2) into a waterway in which the plaintiffs have an interest that is or may be adversely affected by the pollutant and that (3) this pollutant causes or contributes to the kinds of injuries alleged by the plaintiffs.

*Id.* To meet these requirements, a plaintiff must show more than "a mere exceedance of a permit limit." *Id.*

In the present case, FOE and CLEAN failed to establish the second requirement of the substantial likelihood analysis: that Gaston Copper's discharges were present in a waterway in which FOE and CLEAN's members had an interest that is or may be adversely affected by the effluent. First, FOE and CLEAN did not present evidence that the allegedly affected waterways—Shealy's lake and portions of the Edisto River—contained effluents of the type that Gaston Copper discharges. Neither Gaston Copper's laboratory toxicity tests, nor its 1993 and 1994 studies, was performed on Shealy's lake or portions of the Edisto River. Second, while it is true that Lake Watson flows into the Boggy Branch, "a tributary of Bull Swamp Creek, which flows into the North Fork of the Edisto River," (J.A. 70), the Edisto River is ten to fifteen miles from Gaston Copper, and Shealy's lake is four miles downstream from Gaston Copper (with thirty-one intervening ponds and three other tributaries running into his lake). Consequently, even though water flows downstream, the distances between the source of the alleged pollution (Gaston Copper), and the waterways used by Shealy, Jones, and McCullough (Shealy's lake and the Edisto River), is simply too great to infer causation.[7] *See Friends of Earth v. Crown Cent. Petroleum,* 95 F.3d 358, 361–62 (5th Cir.1996) (concluding that because the source of discharge, eighteen miles and three tributaries from the allegedly affected waterways, was too far upstream from the waterways used by the plaintiffs to infer causation, the plaintiffs were required to establish the fairly traceable element of standing by producing water samples or expert testimony to establish "the presence of a pollutant of the type discharged by the defendant upstream").[8]

---

7. We are not requiring that a plaintiff establish a certain mileage or tributary limit in order to satisfy the fairly traceable prong of standing. FOE and CLEAN's reliance on the proposition that water flows downstream is, however, simply insufficient to establish the fairly traceable element of standing.

8. In concluding that Shealy established traceability, the dissent again relies on DHEC's statement that "runoff" from Gaston Copper reaches the Edisto River and the fact that DHEC tested Shealy's lake prior to the time relevant to this action and found pollutants in his lake.

In sum, even assuming that FOE and CLEAN established injury in fact, because FOE and CLEAN failed to establish that Gaston Copper's discharges contributed to the alleged pollution that interferes with their members' use of Shealy's lake or the Edisto River, we conclude that FOE and CLEAN lack standing to pursue their citizens suit.[9]

### III

One final word regarding the dissent. The dissent suggests our decision will unnecessarily create minitrials on the issue of standing. To the contrary, our opinion simply stands for the basic proposition that if a plaintiff organization craves standing, it must allege sufficient facts, which if proven, would entitle it to standing. Nothing more; nothing less. We have not raised the threshold for establishing standing; rather, we are simply requiring a plaintiff organization to allege sufficient facts demonstrating actual or imminent injury fairly traceable to the defendant's conduct before standing attaches. In this case, FOE and CLEAN failed to meet this fairly low threshold.

In sum, because we hold that FOE and CLEAN lacked standing to pursue their CWA claims against Gaston Copper, we affirm the district court's judgment dismissing FOE and CLEAN's action for lack of jurisdiction.

*AFFIRMED.*

WILKINSON, Chief Judge, dissenting:

I respectfully dissent. The majority encroaches on congressional authority by

---

We fail to see how this evidence relied upon by the dissent demonstrates that there was a substantial likelihood that Gaston Copper's conduct caused Shealy's alleged injury. DHEC's statement simply does not establish that there was a substantial likelihood that pollutants traveled from Lake Watson into Boggy Branch into Bull Swamp Creek into thirty-one ponds and then into Shealy's lake. DHEC's statement simply states the truism that water flows downstream. Further, the fact that DHEC tested Shealy's lake in 1990 and found pollutants in the lake does not establish that there was a substantial likelihood that Gaston Copper's subsequent conduct caused Shealy's alleged injury. No evidence was admitted that the pollutants found in Shealy's lake by DHEC in 1990 were traceable to Gaston Copper's predecessor. Thus, the DHEC 1990 test does not establish that there was a substantial likelihood that Gaston Copper's subsequent discharges after 1991 caused Shealy's alleged harm.

9. FOE and CLEAN contend that under *Sierra Club v. Simkins Industries, Inc.*, 847 F.2d 1109 (4th Cir.1988), they have standing to bring a CWA claim for Gaston Copper's alleged monitoring and reporting violations. We disagree. In *Simkins*, the plaintiff organization brought a CWA claim for monitoring and reporting violations, but did not bring a CWA claim for effluent discharge violations. *See* 847 F.2d at 1112. We concluded in *Simkins* that the plaintiff organization had standing to bring an action for the defendant's admitted monitoring and reporting violations because the plaintiff organization established that one of its members used the affected waterway, had a desire to protect the affected waterway that he used, and that these interests could be adversely affected by the defendant's failure to monitor and report its effluent discharges. *See id.* at 1113. With regard to whether the plaintiff organization established that its desire to protect the affected waterway was adversely affected, we concluded that the plaintiff organization did indeed establish such. *See id.* (finding "information on any harmful level of pollutants in the area of [the defendant's] plant during this time period is forever lost to . . . those who might undertake to remedy the effects of any pollution" and the lack of information threatens the interests of the member, who attested that he used the affected waterway, in protecting the affected waterway and curtailing pollution into such waterway).

Unlike the plaintiff organization in *Simkins*, FOE and CLEAN failed to establish that their members recreated or used a waterway adversely affected or capable of being adversely affected by the defendant's (Gaston Copper's) conduct. As discussed *supra*, FOE and CLEAN failed to show that the Shealy's lake and the Edisto River contained effluents of the type Gaston Copper discharged. FOE and CLEAN also failed to submit expert testimony that the effluents discharged from Gaston Copper could adversely affect the waterways in which the members recreated or used. Accordingly, *Simkins* is of no help to FOE and CLEAN.

erecting standing hurdles so high as to effectively excise the citizen suit provision from the Clean Water Act. The majority also departs from other circuits by refusing to consider the claims of a citizen living within the known discharge range of a polluting industrial facility. Article III does not command this evisceration of the Act's protections, and separation-of-powers principles positively oppose it.

Appellant Citizens Local Environmental Action Group (CLEAN) accuses Gaston Copper Recycling Corporation of pumping illegal chemical concentrations from its smelting plant into Lake Watson on over five hundred occasions. From Lake Watson, Gaston Copper's discharge flows to Boggy Branch, through Bull Swamp Creek, and onto the Edisto River. The South Carolina Department of Health and Environmental Control (DHEC) has stated publicly that Gaston Copper's discharge will flow to the Edisto, 16.5 miles downstream. Yet only four miles away, Wilson Shealy swims and fishes with his grandchildren in a lake next to his home that is fed by Bull Swamp Creek.[1]

The majority would require Shealy to present laboratory tests to prove both the existence of injury in fact and its traceability to Gaston Copper. Alternatively, the majority would postpone Shealy's claim until his lake becomes so polluted as to show "observable negative impact." *Ante* at 113–14. Nothing in Article III suggests that our jurisdiction hinges on such elevated standards of proof.

"[T]he law of Art[icle] III standing is built on a single basic idea—the idea of separation of powers." *Allen v. Wright,* 468 U.S. 737, 752, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). But today's holding is an expansive act, not one of restraint. This case is not, as the majority implies, simply "a vehicle for the vindication of the value interests of concerned bystanders." *Valley Forge Christian College v. Ameri-*

*cans United for Separation of Church & State,* 454 U.S. 464, 473, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (internal quotation marks omitted). Shealy is not a roving ombudsman seeking to right environmental wrongs wherever he might find them. He is a real person who owns a real home and lake in close proximity to Gaston Copper. The company's discharge violations thus affect the concrete, particularized legal rights of this specific, actual citizen— an issue "traditionally thought to be capable of resolution through the judicial process." *Allen,* 468 U.S. at 752, 104 S.Ct. 3315 (internal quotation marks omitted). By turning away this garden-variety Clean Water Act claim, the court overshoots standing doctrine's legitimate constitutional boundaries to gut a legislative act and thwart the will of representative government.

The majority's failure to uphold Gaston Copper's obligations also "profoundly affect[s] the lives, liberty, and property" of those, like Shealy, who count on the quality of their waters. *Valley Forge,* 454 U.S. at 473, 102 S.Ct. 752. The Clean Water Act commands that companies such as Gaston Copper shall not discharge dangerous chemical concentrations into our nation's waters, and grants citizens in the path of that efflux a cause of action to control it. *See* 33 U.S.C. § 1365. The "injury required by Art[icle] III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 578, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotation marks omitted). Yet the majority's super standing requirement renders Shealy's legal rights—and hence Gaston Copper's legal obligations—null in all but word.

There is also a practical drawback. Today's holding sets courts up for the litigation of scientific facts as a matter of standing—facts unnecessary to the ultimate

---

1. Since there is no evidence that Guy Jones and William McCullough used the waterway within this discharge zone, the district court correctly dismissed the claims of appellant Friends of the Earth.

questions presented in these cases. Under the majority's regime, standing requirements will assume a complicated life of their own. As defendants concentrate on undermining plaintiffs' claims of injury or traceability, courts should now prepare for threshold "battles of the experts" over matters of degree. What concentration of a given dissolved chemical is sufficient to cause "observable negative impact"? To what extent does a given toxin cause injurious health effects? The exhaustive exposition and proof of such matters will create expensive, lengthy sideshows to the straightforward issue under the Clean Water Act—namely, whether a defendant is violating its discharge permit.

It may be that CLEAN's interpretation of Gaston Copper's discharge permit is incorrect and that the company thus has not violated the Clean Water Act. But that is a merits question. Unlike the majority, I believe that Wilson Shealy—and hence appellant CLEAN—has standing to pursue that question. I would reverse the judgment of the district court.

## I.

Lost in the majority's rendition of the record is a simple reality: Gaston Copper has been accused of violating its discharge permit, its discharge affects or has the potential to affect the waterway for 16.5 downstream miles, and Wilson Shealy sits a mere four miles from the mouth of the discharge pipe. Whether we characterize the harm as the actual pollution of the waterway, Shealy's reasonable fear and concern, or Gaston Copper's threat to the waterway is unimportant. Shealy has proven injury in fact. In holding otherwise, the majority ignores facts in the record, averts its gaze from this downstream citizen's legitimate health and environmental concerns, and raises the bar for all citizens seeking relief from their neighbors' pollution.

The record is replete with evidence that Gaston Copper is fouling its receiving waters. The plaintiffs submitted discharge monitoring reports spanning four years of Gaston Copper's operations, which they claim show over five hundred violations of the company's discharge limits—including its limits for copper, cadmium, zinc, lead, and pH. The plaintiffs also offered evidence as to the adverse health and environmental effects of these chemicals. For example, copper is particularly toxic to aquatic organisms and can prevent spawning in fish, while cadmium and lead cause a variety of adverse human health effects including neurological damage and cancer. Indeed, EPA and DHEC developed the company's permit limits pursuant to a statutory command to protect public health, fish, and wildlife and to "allow recreational activities in and on the water." 33 U.S.C. § 1312(a).

Furthermore, the plaintiffs submitted evidence that these exceedences could and did cause environmental degradation. Gaston Copper failed fully forty-one whole effluent toxicity tests in the forty-nine months between March 1991 and March 1995—tests that consist of placing small organisms in samples of the effluent and counting the number that sicken.[2] Even the company's own studies showed elevated quantities of copper, cadmium, lead, and mercury in sediment taken from the facility's receiving waters and unnatural metals concentrations in the tissue of fish. Gaston Copper's permit exceedences thus bear a direct relationship to the river's downstream health.

The majority stresses that Gaston Copper's annual studies found no "apparent degradation" of macroinvertebrate life and

2. Although the majority claims that the plaintiffs' expert "was unable to relate the toxicity tests to the alleged March 1, 1991 Permit water quality effluent limit violations," *ante* at 111, that expert testified only that he had not cross-checked the two sets of data and therefore that he simply did not know if a relationship existed. Moreover, CLEAN notes that the record data show that eight of the company's toxicity failures occurred on days when the company also violated its water quality effluent limits.

that downstreams ediment concentrations were "less than previous years" and "similar to values seen throughout South Carolina." *Ante* at 111–12. These studies,however, present only year-to-year comparisons. They thus show at most that Gaston Copper is not performing worse than in previous years, not that its current discharge has no injurious effect. The facility's past violations do not immunize Gaston Copper's current defalcations. As for the comparison to other locations in South Carolina, the Clean Water Act requires Gaston Copper not to meet other denominators, but to discharge at safe levels established by its permit.

Moreover, Gaston Copper's discharge affects or can affect a significant distance downstream. Although the majority persistently denies that the plaintiffs submitted any evidence on this score—and implies that Gaston Copper's discharge may never leave Lake Watson—the record establishes the company's potential downstream plume with unusual specificity. In the comment period for Gaston Copper's own permit a DHEC representative answered one downstream property owner's query as follows:

[Q:] I own property where Bull Swamp goes into the Edisto River, and I'd like to know, would the runoff go that far?

[A:] Yes, the runoff will go to Boggy Branch to Bull Swamp to the Edisto River. The confluence of Bull Swamp and [the] Edisto River is 16.5 miles.

The citizen who submitted this query knew full well the "truism that water flows downstream." *Ante* at 115 n. 8. Indeed, this property owner's question and DHEC's response presuppose such downstream flow. Common sense dictates that the question had a further purpose: to determine just how far downstream Gaston Copper's discharge would affect property owners. And the clear implication of DHEC's response is that Gaston Copper's illegal discharges can impact the receiving waterway for a good distance downstream—well past Shealy's property and on down to the Edisto River itself. In fact, Shealy's lake and home lie much closer to Gaston Copper than to the Edisto River.

The majority claims that "there are thirty-one ponds between Bull Swamp Creek and [Shealy's] lake," as if to negate the implication of the lake's proximity to Gaston Copper. *Ante* at 110 n. 2. But since the evidence shows that Gaston Copper's discharge can reach Shealy's lake, the number of "intervening ponds," *ante* at 115, is simply irrelevant. Indeed, Shealy's uncontroverted testimony established at trial that chemicals from the plant had been found in his lake. Shealy explained that DHEC employees had visited his property, analyzed his water quality, and reported the presence of copper, zinc, nickel, iron, and PCBs—the same chemicals the plant has in the past released in its wastewater.

Shealy has limited his use and enjoyment of his lake out of concern for the quality of its water. As he testified at trial: "I limit the fish I can eat, I limit the amount of time that I let my children and grandchildren swim in the water." He claimed that he would catch and eat more fish if he could be more confident that his lake were not polluted, and that he would let his children and grandchildren swim in the lake more often. He further testified that others had referred to his lake as "the polluted pond," and that this reputation diminished the value of his property.

Shealy's standing to sue thus does not rest, as the majority suggests, solely on amorphous or generalized concern. *Ante* at 114. He has shown not only that Gaston Copper's violations harm the waterway, but also that he is "himself among the injured." *Sierra Club v. Morton*, 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 ·(1972). As the majority recognizes, "[a]esthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our soci-

ety." *Id.* at 734, 92 S.Ct. 1361; *accord Sierra Club v. Simkins Indus., Inc.,* 847 F.2d 1109, 1113 (4th Cir.1988). The importance of human health concerns is likewise beyond question. And we have direct evidence of Shealy's nexus with these harms, including his location in the recognized path of the Gaston Copper's discharge and his experience of past pollution from the plant.

Nevertheless, the majority believes that Shealy lacks an injury in fact. Indeed, the majority rejects Shealy's evidence of past pollution on the sole ground that DHEC's tests occurred before Gaston Copper purchased the smelting facility in 1990. *Ante* at 111 n. 3. But this evidence is directly relevant to the question of whether Gaston Copper's plant is affecting or could affect Shealy's property. This suit was filed in 1992, not long after Gaston Copper purchased the plant. And from 1990 through 1993 Gaston Copper operated the smelting facility using the very same treatment system to process its wastewater as its predecessor had. The purpose of the injury-in-fact requirement is simply to ascertain whether Shealy's interests "were actually, or [are] inimminent threat of being, adversely affected by pollution" from this facility. *Ante* at 113–14. In testifying that the pollution from this exact system has in the past reached his lake, Shealy showed that his current fears are based on much more than "mere speculation." *Ante* at 113–14.[3]

More surprising still is the majority's denial that Gaston Copper's discharge even poses a threat to the downstream waterway. "[O]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) (internal quotation marks omitted). The purpose of the imminence requirement, when properly applied, is simply to ensure that the injury is concrete and "not too speculative for Article III purposes." *Defenders of Wildlife,* 504 U.S. at 564–65 n. 2, 112 S.Ct. 2130. That is plainly the case here. Gaston Copper's permit violations *ipso facto* pose a concrete threat to the receiving waters within the range of its discharge, including the lake on Shealy's property. By establishing that Gaston Copper is polluting Shealy's nearby water source, CLEAN has proven an increased risk to its member's downstream uses. This threatened injury is sufficient to provide injury in fact.[4]

The majority would, however, require evidence that it can touch and feel before it is willing to acknowledge Shealy's threatened injury. But the Constitution does not require Shealy to wait until his lake becomes "barren and sterile" or assumes an "unpleasant color and smell" before he may seek relief in court. *Ante* at 113–14. Nor must Shealy produce tests to prove that his injury is imminent. Indeed, he cannot—for if an injury is threatened it by definition has not yet occurred.

Citizens can rely on circumstantial evidence such as proximity to polluting sources, predictions of discharge influence, and past pollution to prove injury in fact, just as they would to prove any other

3. The majority denies that these pollutants are traceable to Gaston Copper's predecessor. *Ante* at 114 n. 6, 115 n. 8. But DHEC's testing shows that the plant has in the past (1) discharged a pollutant into the upstream waterway (2) of the type that appeared in Shealy's lake and (3) of the type that causes the injury of which he complains. *See ante* at 114–15. I am not sure what additional evidence the majority would require.

4. Because Shealy "recreated or used a waterway adversely affected or capable of being adversely affected by the defendant's (Gaston Copper's) conduct," *ante* at 116 n. 9, Gaston Copper's monitoring and reporting violations also cause him injury in fact. CLEAN thus has standing to pursue its monitoring and reporting claims—regardless of whether any actual toxins have yet reached Shealy's lake—under a straightforward application of this circuit's precedent in *Simkins Industries,* 847 F.2d at 1113.

contested issue. To require Shealy to fish individual copper molecules out of his lake and haul them into court serves no useful purpose, spawns complicated collateral litigation, and undermines the protections Congress sought to provide in the Clean Water Act.

## II.

The majority's traceability analysis is equally misguided. " 'The fairly traceable' requirement ... is not equivalent to a requirement of tort causation." *Natural Resources Defense Council v. Watkins*, 954 F.2d 974, 980 n. 7 (4th Cir.1992) (quoting *Public Interest Research Group v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 72 (3d Cir.1990)). Instead, "to demonstrate that they are more than concerned bystanders, plaintiffs need only show that there is a substantial likelihood that defendant's conduct caused plaintiffs' harm." *Powell Duffryn Terminals*, 913 F.2d at 72 (internal quotation marks omitted). To establish traceability, plaintiffs simply must demonstrate that a discharge has affected or has the potential to affect the specific geographic areas of concern. *Watkins*, 954 F.2d at 980–81.

I believe that Wilson Shealy, sitting a scant four miles downstream from this smelting plant, is close enough to that facility for a court to infer traceability. But the plaintiffs in this case have gone farther. First, as noted, Shealy testified to the presence of metals in his lake of the type discharged by Gaston Copper—direct evidence that his interest "is or may be adversely affected" by the upstream smelting plant. *Ante* at 115. Second, the plaintiffs submitted evidence that the company's discharge will travel 16.5 miles downstream—well beyond the four-mile point that is Shealy's lake. CLEAN thus relies on more than just "the proposition that water flows downstream" to prove traceability. *Ante* at 115 n. 7. Shealy's testimony, buttressed by objective evidence from DHEC, establishes that his injuries are traceable to Gaston Copper.

The majority opinion holds, however, that Shealy's injury is not traceable to Gaston Copper's discharge—again primarily because CLEAN did not submit any laboratory analysis showing "that Gaston Copper's discharges *were present*" in Shealy's lake. *Ante* at 115 (emphasis added). This is not the law. I agree that some distinction must be made between plaintiffs who lie within the discharge zone of a polluter and those who are so far downstream that their injuries cannot reasonably be traced to that defendant. *Compare Friends of Earth v. Crown Central Petroleum Corp.*, 95 F.3d 358, 361–62 (5th Cir.1996) (finding an eighteen mile distance "too large to infer causation"), *with Friends of the Earth v. Chevron Chemical Co.*, 900 F.Supp. 67, 75 (E.D.Tex. 1995) (finding a two-to-four mile distance sufficient to show causation). But to turn away a citizen who sits in the acknowledged discharge zone of an industrial plant seems more calculated "to negate the strict liability standard of the [Clean Water] Act" than to articulate any meaningful distinction. *Powell Duffryn Terminals*, 913 F.2d at 73 n. 10. Indeed, to require scientific proof that the discharge has already reached the plaintiff would eliminate the claims of those who are directly threatened but not yet engulfed by a company's illegal discharge. I cannot believe that Article III bars such concrete disputes from court.

## III.

The majority's approach also splits from the path of our sister circuits in three distinct ways. First, no circuit has required additional scientific proof where there was a direct nexus between the claimant and the area of environmental impairment. In *Sierra Club v. Cedar Point Oil Co.*, for example, the Fifth Circuit held that citizens' concern about water quality in the Galveston Bay was sufficient to make out an injury in fact where "[t]wo of the affiants live near Galveston Bay and all of them use the bay for recreational activities." 73 F.3d 546, 556 (5th Cir.

1996). It was enough that "the affiants expressed fear that the discharge ... will impair their enjoyment of these activities because these activities are dependent upon good water quality." *Id.*

Other circuits have analyzed such claims in a similarly straightforward manner. For instance, in *Friends of the Earth v. Consolidated Rail Corp.*, the Second Circuit discussed two citizen affidavits that it found "quite adequately satisfy the standing threshold." 768 F.2d 57, 61 (2d Cir. 1985). In the first, a citizen stated that "he passes the Hudson [River] regularly and find[s] the pollution in the river offensive to [his] aesthetic values." *Id.* In the second, a father "averred that his children swim in the river, his son occasionally fishes in the river and his family has and will continue to picnic along the river." *Id.* Likewise, in *United States v. Metropolitan St. Louis Sewer District* the Eighth Circuit approved the standing of a citizens' group whose members alleged that they "visit, cross, and frequently observe" the Mississippi River and "from time to time ... use these waters for recreational purposes." 883 F.2d 54, 56 (8th Cir.1989).[5] In neither of these cases—where the claims of standing were weaker than the one before us—did the court require further specific allegations or evidence of the actual level of pollution in the water body.[6]

Second, the majority's virtual silence on the issue of threatened injury is at odds with the wide recognition that threats or increased risk constitute cognizable harm. *See, e.g., Cedar Point Oil Co.*, 73 F.3d at 556 ("That this injury is couched in terms of future impairment rather than past impairment is of no moment."). Threatened

injury is by nature probabilistic and not susceptible to proof through laboratory analysis. And yet other circuits have had no trouble understanding the injurious nature of risk. *See Village of Elk Grove Village v. Evans*, 997 F.2d 328, 329 (7th Cir.1993) ("[E]ven a small probability of injury is sufficient to create a case or controversy...."); *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1234–35 (D.C.Cir.1996) (increased risk of wildfire from certain logging practices constitutes injury in fact).

Third, other circuits have stressed that traceability does not require tort-like causation. *See Cedar Point Oil Co.*, 73 F.3d at 557–58; *Natural Resources Defense Council v. Texaco Ref. & Mktg., Inc.*, 2 F.3d 493, 505 (3d Cir.1993); *Powell Duffryn Terminals*, 913 F.2d at 72–73. CLEAN has charged (1) that Gaston Copper exceeds its discharge permit limits for chemicals that cause the types of injuries of concern, and (2) that Shealy's lake lies in the range of that discharge. No court has required additional proof of causation in such a case. *Crown Central Petroleum Corp.*, on which the majority heavily relies, is not to the contrary. *See* 95 F.3d at 361 ("We emphasize that FOE offered *no competent evidence* that [the] discharges have made their way to Lake Palestine or would otherwise effect Lake Palestine." (emphasis added)).

In short, no court has seen fit to restrict citizens such as Wilson Shealy from vindicating their legal rights under the Clean Water Act, and many routinely consider similar claims. In finding that this claim fails to confer standing, the majority stands alone.

---

5. The citizens in these cases, which were decided before *Lujan v. Defenders of Wildlife*, satisfy *Lujan*'s requirement that they "be directly affected apart from their special interest in th[e] subject" of the litigation. 504 U.S. at 563, 112 S.Ct. 2130 (internal quotation marks omitted).

6. Although the majority leans on the Third Circuit's holding in *Public Interest Research Group v. Magnesium Elektron, Inc. (MEI)*, 123 F.3d 111 (3d Cir.1997), that case does not

support today's extension. In *MEI*, not only did the plaintiffs "not allege in their complaint or affidavits any injury" to the water body of interest, *id.* at 121, the district court specifically found that the defendant's discharge did not injure and did not threaten that waterway, *id.* at 116. That express finding foreclosed the recognition of injury and threat of injury that the evidence in this case commands.

## IV.

"We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Cohens v. Virginia,* 19 U.S. (6 Wheat) 264, 404, 5 L.Ed. 257 (1821). As a doctrine of restraint, the requirements of standing prevent the courts from deciding abstract questions. My good colleagues, however, have transformed these requirements of restraint into a sword. Wielding this weapon against the obligations of the Clean Water Act, the majority cleaves the Act's citizen enforcement provision as certainly as by striking it from the statute altogether.

Wilson Shealy presents claims of private damage as concrete as those "matters that were the traditional concern of the courts at Westminster." *Coleman v. Miller,* 307 U.S. 433, 460, 59 S.Ct. 972, 83 L.Ed. 1385 (1939) (opinion of Frankfurter, J.). This case satisfies the case-or-controversy requirement of Article III and should be heard on its merits. I would reverse the judgment and remand for a determination of whether Gaston Copper has discharged pollutants in excess of its permit limits.