**ECOLOGICAL RIGHTS FOUNDATION and Mateel Environmental Justice Foundation, Plaintiffs,**

v.

**PACIFIC LUMBER COMPANY and Does 1 through 20, et al., Defendants.**

No. C–97–0292 MHP.

United States District Court, N.D. California.

Aug. 19, 1999.

## MEMORANDUM AND ORDER

PATEL, Chief Judge.

On January 28, 1997, plaintiffs Ecological Rights Foundation ("ERF") and Mateel Environmental Justice Foundation ("Mateel") filed this action against Pacific Lumber Co. ("PALCO") alleging violations of the Federal Water Pollution Control Act of 1972 ("Clean Water Act," "CWA," or the "Act"), *as amended*, 33 U.S.C. §§ 1311 *et seq.*, California Health & Safety Code section 25249.5 ("Proposition 65"), and California Business & Professions Code sections 17200 *et seq.* Plaintiffs seek declaratory and injunctive relief as well as the imposition of civil monetary penalties for PALCO's alleged violations of the Clean Water Act and state law.

PALCO now seeks summary judgment on several threshold jurisdictional issues. Plaintiffs likewise seek summary judgment on the issue of standing and on PALCO's liability under the CWA. Having considered the parties' arguments and submissions, and for the reasons set forth below, the court enters the following memorandum and order.

## BACKGROUND[1]

Plaintiffs are Humboldt County-based environmental organizations whose purpose is to educate citizens about environmental issues concerning harm to their health, the environment and other resources. Verick Decl., Exh. A, at 1; Evenson Decl., Exh. A, at 1. Plaintiffs allege that their members have spent varying amounts of time in and around Yager Creek and the Eel River watershed in Humboldt County. *See, e.g.,* Fir Decl.; Verick Decl. Plaintiffs assert that PALCO has injured their members by discharging contaminated non-storm water and storm water containing carcinogenic pollutants and high levels of sediment from two logging facilities, Yager Camp and Carlotta Sawmill, owned and operated by PALCO.

Sharon E. Duggan, Law Offices of Sharon Duggan, San Francisco, CA, for Plaintiffs.

Michael D. Macomber, Jared G. Carter, Cindee F. Mayfield, Carter Behnke Oglesby & Bacik, Ukiah, CA, for Defendants.

1. Unless otherwise noted, the facts herein are taken from the parties' "Joint Statement of Undisputed Material Facts."

Both facilities are situated along the banks of Yager Creek, which is part of the Eel River watershed and flows into the Van Duzen River approximately one mile downstream from Carlotta mill. Both Yager Camp and Carlotta mill are located about twelve miles from the point at which the Eel River flows into the Pacific Ocean.

PALCO purchased Yager Camp and Carlotta mill from the Louisiana Pacific Corporation ("Louisiana Pacific") on May 16, 1986. The Yager Camp truck shop complex and log deck area consists of a wood waste recovery and composting area, log decks, a truck shop and a fish hatchery. Carlotta mill, which is located approximately two miles downstream from Yager Camp, consists of a sawmill, a planer, log decks, lumber storage facilities, truck shops, an aggregate crusher, stockpile and a loading area. Louisiana Pacific's operations at the two facilities included the production and use of stain control chemicals, including PCP and copper-8-quinolinolate. Prevost Decl., Exh. A-2 (Regional Water Quality Control Board ("RWQCB") Clean-up and Abatement Order No. 97-106). Plaintiffs allege that these wood treatment chemicals contain dioxins and furans, both of which are carcinogenic substances. Compl., at ¶ 35. Although PALCO discontinued the use of these stain control chemicals when it purchased Yager Camp and Carlotta mill from Louisiana Pacific, plaintiffs maintain that these chemicals and other pollutants have been detected in samples of non-storm water and storm water discharges at levels greater than that authorized. Prevost Decl., Exh. A-2 at 5 (RWQCB Clean-up and Abatement Order No. 97-106); see Compl., at ¶¶ 34-35.

Plaintiffs contend that as storm water flows across PALCO's facilities into Yager Creek it picks up chlorophenic wood treatment chemicals such as PCP, as well as tannin, sediment, and used motor oil containing carcinogenic polycyclic aromatic hydrocarbons. Compl., at ¶¶ 34-35. According to plaintiffs, the discharged pollutants degrade the water quality of Yager Creek by increasing sedimentation and turbidity, lowering its pH, and by being absorbed into the fatty tissues of animal organisms· and causing a wide range of maladies in the animals into which the chemicals are absorbed and their predators. Id. at ¶ 35. Although PALCO contends otherwise, these alleged contaminated discharges appear to have been unabated. For example, the RWQCB issued a Clean-up and Abatement Order ("Abatement Order") to PALCO for its Carlotta mill operations on September 10, 1997. See Prevost Decl., Exh. A-2. In the Abatement Order, the RWQCB noted that although PALCO had taken steps to eliminate non-storm water related discharges PALCO had caused or threatened to cause the discharge of pollutants and further ordered PALCO to cease such discharges. Id. at 7. Moreover, laboratory tests on water samples from Carlotta mill discharges have shown varying amounts of pollutants. For example, lab tests of a sample taken of discharges from Carlotta mill's sawmill sump on January 31, 1997, showed 1.3 (micro)g/L pentachlorophenol, 17,000 (micro)g/L motor oil, and 2.5 (micro)g/L toluene. Jt. Stmt. Undisp. Facts, at ¶¶ 76-77. Similarly, lab tests of a discharge sample taken from Carlotta mill's MW-4 and MW-3 on October 14, 1997, showed .34(micro)g/L pentachlorophenol and 55 (micro)g/L total petroleum hydrocarbons, 9.7 (micro)g/L benzene and .76 (micro)g/L toluene. Id. at ¶¶ 79-81.

A brief description of the various regulations and facts relating to PALCO's alleged discharges from these facilities is helpful in resolving the jurisdictional issues presented herein.

A. *Legal Framework*

The Clean Water Act was enacted in 1972 "to restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In order to achieve these goals, section 301(a) of the Act flatly prohibits the discharge of any pollutant into navigable waters except

as authorized by the Act. 33 U.S.C. § 1311(a); *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 52, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). Any person wishing to discharge limited amounts of pollutants must obtain a National Pollutant Discharge Elimination System ("NPDES") permit from either the United States Environmental Protection Agency ("EPA") or an equivalent state government permitting program. In an effort to remedy the threat of pollution carried by storm water runoff into drainage systems, streams and reservoirs, Congress amended the Clean Water Act in 1987 to also require persons discharging storm water to obtain a NPDES permit. *See* 33 U.S.C. § 1342(p).

The Clean Water Act requires the EPA to administer the NPDES permit program under which the EPA may issue permits for the discharge of pollutants into waters of the United States in accordance with conditions imposed by the Act. 33 U.S.C. § 1342(a). The Act allows state governments to assume NPDES permitting responsibilities upon approval by the EPA. 33 U.S.C. § 1342(b). States may also request authority to issue general permits for similar dischargers with the same or similar effluent limitations. *See* 40 C.F.R. § 122.28. Pursuant to this authority, the California State Water Resources Control Board ("SWRCB") administers a federally-approved state NPDES permit program. *See* 54 Fed.Reg. 40664 (October 3, 1989); 40 C.F.R. §§ 122.28 & 122.62. In 1991, the SWRCB issued General Permit No. CAS000001, Water Quality Order No. 91–13–DWQ, and subsequently amended it with SWRCB Water Quality Order 92–12 DWQ ("1992 Permit"). Compl., Exh. C, at 1.

In order to satisfy NPDES permitting requirements and to obtain authorization for non-storm and storm water discharges, facility operators are required to either submit a Notice of Intent ("NOI") to comply with the general permit conditions or apply for an individual NPDES permit. Jt. Stmt. of Undisp. Facts, at ¶ 3; Evenson Declaration, Exh. A, at VIII. On March 25, 1992, PALCO filed separate NOIs to be bound to the provisions of the 1992 Permit for its operations at Yager Camp and Carlotta mill. D's Exh. to Jt. Stmt., Exh. C–6 ("Storm Water Pollution Prevention Plan Yager Camp Facility, November 1996"), at 1; Evenson Decl., Exh. A ("Storm Water Pollution Prevention Plan Carlotta Sawmill, February 1997"). The NOI for Carlotta mill was approved on October 24, 1992, and the Yager Camp NOI was approved on January 19, 1993. *Id.*

The SWRCB is also permitted to modify, revoke, reissue or terminate NPDES general permits under several enumerated conditions and as authorized by 40 C.F.R. sections 122.62 *et seq.* The 1992 Permit expired on November 19, 1996. Evenson Decl., Ex A–1, at 4 ¶ 7. The 1992 Permit, however, "continues in force and effect until a new general permit is issued or the State Water Board rescinds the general permit." Evenson Decl., Exh. A–1, at 24 ¶ 18. Only those dischargers authorized to discharge pollutants under the expiring general permit were covered by the continuing general permit. *Id.* On April 17, 1997, the SWRCB issued a revised General Permit No. CAS000001, Water Quality Order No. 97–03–DWQ ("1997 Permit"), effective July 1, 1997, and at the same time, rescinded the 1992 Permit. *See* Evenson Decl., Exh. A–2, at 13. The 1997 Permit provides for no natural expiration date, but rather, "continues in force and effect until a new general permit is issued or the State Water Board rescinds the General Permit." *Id.* at 65. However, as with the 1992 Permit, facility operators subject to the reissued general permit are required to file a revised NOI upon the permit's reissuance by the SWRCB or to apply for an individual NPDES permit. *Id.* at 4 ¶ 7. PALCO subsequently submitted a NOI to comply with the 1997 Permit for Yager Camp and Carlotta mill.

NPDES general permits provide for detailed specifications on the types and quantities of pollutants that a permit holder

may discharge and impose monitoring and testing requirements to ensure compliance with the permit. *See* 33 U.S.C. §§ 1342 & 1318(a); 40 C.F.R. §§ 122.41(j) & 122.48. In broad terms, the 1992 Permit imposes three requirements on facility operators. Section A of the 1992 Permit requires facility operators to develop and implement by October 1, 1992, a storm water pollution prevention plan ("SWPPP"), including the implementation of BMPs, according to requirements set forth in the permit. Section B requires facility operators to implement a monitoring program by January 1, 1993. *See* Evenson Decl., Exh. A–1 at 11; Jt. Stmt. of Undisp. Facts, at ¶ 63. The monitoring program requires that facility operators perform visual observations for the presence of unauthorized non-storm water discharges during the wet and dry seasons, conduct an annual inspection to determine compliance with permit conditions, and implement a sampling and analysis program. *Id.* at 11. Finally, facility operators are required to halt most non-storm water discharges and discharges containing hazardous substances in storm water in excess of reportable quantities established at 40 C.F.R. section 117.3 and 40 C.F.R. section 302.4. Evenson Decl., Exh. A–1 at 9. In accordance with section "A" of the 1992 Permit conditions, PALCO completed a SWPPP and monitoring plan for Carlotta mill in January 1993 and revised it in March 1994. Evenson Decl., Exh. J ("Storm Water Pollution Prevention Plan Carlotta Sawmill February 1997"), at 318. Although also required by the 1992 Permit to develop and implement a SWPPP for the Yager Camp by October 1, 1992, PALCO had not finalized and submitted a Yager Camp SWPPP containing a monitoring plan to the North Coast Regional Water Quality Control Board ("RWQCB") until November 8, 1996. Jt. Stmt. of Undisp. Facts., at ¶ 6. PALCO revised the SWPPP in response to comments from the RWQCB on January 27, 1997, and it was subsequently certified.

Although the 1997 Permit requires facility operators to adhere to essentially the same guidelines and prohibitions of the 1992 Permit, the 1997 Permit includes several revisions to the 1992 Permit. *Id.* at 1–3. For example, the 1997 Permit provides for fixed deadlines for facility operators to implement revisions to SWPPPs, requires best management practices ("BMPs") for authorized non-storm water discharges, increases the number of visual observations required for the presence of authorized and unauthorized non-storm water discharges from twice per year to quarterly observations, and imposes several new sampling and testing requirements. *Id.* Facility operators such as PALCO which submitted a NOI pursuant to the 1992 Permit are required to continue to implement their existing SWPPP and monitoring program and "implement any necessary revisions" to the SWPPP and monitoring program "in a timely manner, but in no case later than August 1, 1997." *Id.* at 16 & 34. PALCO submitted a fourth revision of the Carlotta mill SWPPP on July 31, 1997, to ensure compliance with the "reissued General Permit" in 1997.

## B. *The Present Action*

Private citizens may sue to enforce effluent limitations or standards, which are defined to include violations of NPDES permits. 33 U.S.C. §§ 1365 & 1342(k). A prospective plaintiff must provide the alleged violator, the EPA Administrator, and the State in which the alleged violation occurs with written notice of the alleged violations at least sixty days before bringing suit. 33 U.S.C. § 1365(b); *see* 40 C.F.R. Pt. 135. The 60–day notice must

> include sufficient information to permit the recipient to identify the specific standard, limitation or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 135.3(a).

On October 30, 1996, plaintiffs provided PALCO with a 60–day notice of intent to

sue for alleged violations of the Act at PALCO's Yager Camp facility ("Yager Camp letter"). In the Yager Camp letter, plaintiffs notified PALCO of their intent to sue for violations of "General Storm Water Permit No. CAS000001" at Yager Camp. The alleged permit violations include:

(1) contaminated storm water discharges in violation of the General Permit by failing to implement necessary BMPs during each rainfall of more than 0.1 inch of rain at the Yager Camp log deck;

(2) failure to prepare and implement an adequate SWPPP, which complies with "best available technology economically achievable" ("BAT") and "best conventional pollution control technology" ("BCT") standards, by October 1, 1992, as required by sections A(1) and A(2) of the General Permit;

(3) failure to prepare and implement adequate monitoring plans by October 1, 1992, as required by section B(2) of the General Permit;

(4) failure to conduct visual observations at all storm water discharge locations on twenty-seven separate occasions;

(5) failure to conduct at least two dry season visual observations per year for the presence of non-storm water discharges;

(6) failure to collect and analyze storm water discharge samples on several occasions during the 1992 to 1996 time period; and finally,

(7) failure to submit adequate, timely reports in each of the years from 1992 to 1996.

*See* Compl., Exh. A (Yager Camp letter); Jt. Stmt. Undisp. Facts, at ¶¶ 3–5. At the time PALCO received the Yager Camp letter, it had neither a SWPPP nor a monitoring plan for Yager Camp. Jt. Stmt. Undisp. Facts, at ¶ 5. However, as noted above, PALCO finalized its SWPPP and monitoring plan for Yager Camp on November 8, 1996, which was approved on January 27, 1997, after being once revised.

On November 12, 1996, plaintiffs also sent to PALCO a 60–day notice of intent to sue letter ("Carlotta letter") for alleged violations of the CWA and Proposition 65 at Carlotta mill. The Carlotta letter notifies PALCO of plaintiffs' intent to sue for violations at Carlotta mill, including:

(1) discharges of contaminated storm water in violation of the 1992 Permit during each rainfall of more than 0.1 inch of rain at Carlotta mill log deck since October 1, 1992;

(2) failures to amend its Carlotta mill SWPPP after changes in operations and other practices at Carlotta mill;

(3) failure to prepare and implement adequate monitoring plans;

(4) failure to conduct visual observations at all storm water discharge locations;

(5) failure to conduct at least two dry season visual observations per year for the presence of non-storm water discharges at all storm water discharge locations;

(6) failure to collect and analyze storm water discharge samples on several occasions; and,

(7) failure to submit adequate, timely reports in each of the years and comply with other requirements of the 1992 Permit.

*See* Compl., Exh. B (Carlotta letter). At the time PALCO received the Carlotta letter, it was preparing a second revision to the Carlotta mill SWPPP, which was completed in February 1997. The second revision was adopted by the RWQCB on February 13, 1997. Plaintiffs have since dropped the first and second causes of action alleging permit violations at Yager Camp and Carlotta mill due to storm water discharges during periods of rainfall of greater than 0.1 inch. Jt. Stmt. Undisp. Facts, at ¶ 7.

Mateel and ERF filed this action against PALCO on January 28, 1997, and subsequently filed a first amended complaint on August 12, 1998. In its original complaint,

plaintiffs alleged many of the violations of the 1992 Permit to which they pointed in their notices of intent to sue. In contrast, plaintiffs now allege in their first amended complaint six causes of action based on violations of the 1997 Permit at Yager Camp and Carlotta mill, but do not mention that the 1992 Permit expired and was reissued in 1997. Plaintiffs simply append the 1997 Permit to their amended complaint. Although plaintiffs allege illegal storm water discharges, the brunt of the complaint challenges inadequacies in PALCO's development and implementation of the SWPPPs and monitoring plans at the two facilities. The causes of action alleged by plaintiffs include the following:

(1) discharges of pollutants at Carlotta mill and Yager Camp in violation of the General Permit on at least 334 separate occasions due to storm water flows over the mill's facilities;

(2) failure to develop and fully implement an adequate SWPPP at Carlotta mill and Yager Camp by failing to comply with BAT and BCT standards and with BMPs for logging operations; and,

(3) failure to develop and implement an adequate monitoring, reporting and sampling program for Carlotta mill and Yager Camp; and

Compl., at 24–35.

## LEGAL STANDARDS

### I. Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (the nonmoving party may not rely on the pleadings but must present

significant probative evidence supporting the claim).

"[E]ach element of Article III standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.' " *Bennett v. Spear*, 520 U.S. 154, 167, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). In response to a summary judgment motion on the issue of standing, the plaintiff cannot rest on "mere allegations," but rather, must set forth by affidavit or other competent evidence "specific facts which for the purposes of the summary judgment motion will be taken to be true." *Defenders of Wildlife*, 504 U.S. at 561, 112 S.Ct. 2130 (1992); *Lujan v. National Wildlife Federation ("NWF ")*, 497 U.S. 871, 884 & 888–89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). "Consequently, plaintiffs must show there is no genuine dispute as to material facts regarding their standing and that they have standing as a matter of law." *Citizens for a Better Environment—California v. Union Oil of California ("CBE–Calif.")*, 996 F.Supp. 934, 937 (N.D.Cal.1997). If the defendant fails to show that plaintiff has raised no genuine issue of fact after the plaintiff offers evidence to support the allegation, the case should proceed to trial on the merits, where the plaintiff must prove the allegations in order to prevail. *Gwaltney*, 484 U.S. at 66, 108 S.Ct. 376.

### II. Standing

Article III, section 2 of the United States Constitution extends the judicial power of the federal courts only to cases or controversies. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, ——, 118 S.Ct. 1003, 1016, 140 L.Ed.2d 210 (1998). Under Article III, federal courts cannot entertain a litigant's claims unless that party has demonstrated it has constitutional and prudential standing to sue.

*Defenders of Wildlife,* 504 U.S. at 560, 112 S.Ct. 2130.

The party invoking federal jurisdiction bears the burden of establishing the "irreducible constitutional minimum of standing." *Defenders of Wildlife,* 504 U.S. at 560, 112 S.Ct. 2130. To do this, the plaintiff must have suffered an "injury in fact" which is "concrete and particularized" and "actual or imminent"; the injury has to be fairly traceable to the challenged action of the defendant, and not the result of some third party not before the court; and, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be redressed by a favorable decision." *Id.* at 560–61, 112 S.Ct. 2130 (internal quotations and citations omitted). In addition, where Congress is the source of the alleged violation, the Supreme Court has recognized a prudential component to standing requiring that the plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision invoked. *Bennett v. Spear,* 520 U.S. 154, 162–63, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997).

An organization may have standing to sue "in its own right . . . to vindicate whatever rights and immunities the association itself may enjoy." *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). To establish organizational standing, an association must "meet the same standing test that applies to individuals by showing actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." *Spann v. Colonial Village, Inc.,* 899 F.2d 24, 27 (D.C.Cir.), *cert. denied,* 498 U.S. 980, 111 S.Ct. 508, 112 L.Ed.2d 521 (1990) (internal quotations and citations omitted). "In those cases where an organization is suing on its own behalf, it must establish concrete and demonstrable injury to the organization's activities—with a consequent drain on the organization's resources—constituting more than simply a setback to the organization's abstract social interests. Indeed, the organization must allege that discrete programmatic concerns are being directly and adversely affected by the challenged action." *Common Cause v. Federal Election Comm'n,* 108 F.3d 413, 417 (D.C.Cir.1997) (quoting *National Taxpayers Union, Inc. v. U.S.,* 68 F.3d 1428, 1433 (D.C.Cir.1995)) (internal quotations omitted). *See also Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982).

Even if the organization has not suffered injury to itself, it may have standing to assert the rights of its members if (1) its members would have standing to sue on their own; (2) the interests it seeks to protect are germane to its purpose, and (3) its claim and requested relief do not require participation by individual members. *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). *See also Warth,* 422 U.S. at 511, 95 S.Ct. 2197 ("Even in the absence of injury to itself, an association may have standing solely as the representative of its members"); *Sierra Club v. Morton,* 405 U.S. 727, 734–41, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (association must allege that its members are suffering immediate or threatened injury of the sort that would be a justiciable case had members brought suit individually). "The possibility of such representational standing, however, does not eliminate or attenuate the constitutional requirement of a case or controversy." *Warth,* 422 U.S. at 511, 95 S.Ct. 2197.

### III. *Clean Water Act*

The Clean Water Act "does not require that a defendant 'be in violation' of the Act at the commencement of the suit; rather, the statute requires that a defendant be 'alleged to be in violation.' " *Gwaltney,* 484 U.S. at 64, 108 S.Ct. 376. Because the Clean Water Act does not permit citizen suits for wholly past violations, plaintiffs must point to facts supporting allegations of the existence of ongoing violations or the reasonable likelihood of intermittent future violations to establish an

injury under the CWA. *Id.* at 57, 64, 108 S.Ct. 376. Under Ninth Circuit case law, a plaintiff may establish a violation of the Act "either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations." *Sierra Club v. Union Oil of California*, 853 F.2d 667, 671 (9th Cir.1988) (quoting *Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd.*, 844 F.2d 170, 171–72 (4th Cir.1988), *on remand from*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987)). "Intermittent or sporadic violations do not cease to be ongoing until the date when there is no real likelihood of repetition." *Id.* At the summary judgment phase, the moving party must demonstrate that the " 'allegations were sham and raised no genuine issue of fact.' If the defendant fails to make such a showing after the plaintiff offers evidence to support the allegation, the case proceeds to trial on the merits, where the plaintiff must prove the allegations in order to prevail." *See Gwaltney*, 484 U.S. at 66, 108 S.Ct. 376 (quoting *United States v. SCRAP*, 412 U.S. 669, 689, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973)).

*DISCUSSION*

The parties initially dispute three threshold jurisdictional requirements: (1) whether plaintiffs have the requisite standing to sue; (2) whether the reissuance of the general permit and subsequent actions taken by PALCO have rendered this action moot; and (3) whether PALCO was provided with an adequate 60–day notice of intent to sue letter as required by the Act. Plaintiffs also ask the court to find as a matter of law that PALCO has been and continues to be in violation of the provisions of the General Permit. Because the court finds that the facts presented viewed in a light most favorable to plaintiffs fail to support plaintiffs' assertion that it has standing to pursue this action, the court does not reach the other issues raised by the parties.

■ Plaintiffs must establish that they have either associational or organizational standing to sue in order to invoke this court's jurisdiction. Plaintiffs initially assert that they have organizational standing because PALCO's failure to comply with the monitoring and reporting requirements of the Act has impeded their programmatic interest in educating the public about environmental issues and seeking redress for environmental destruction through the courts. However, the court has found no case law which supports plaintiffs' contention that injury to an organization's informational interests alone resulting from a defendant's failure to comply with monitoring and reporting requirements of the CWA satisfies Article III standing requirements. Those cases which have considered the sufficiency of an informational injury have done so in the context of determining whether members have suffered an injury in fact for the purposes of associational standing. *See, e.g., Sierra Club v. Simkins Indus., Inc.*, 847 F.2d 1109, 1112 n. 3 (4th Cir.1988), *cert. denied*, 491 U.S. 904, 109 S.Ct. 3185, 105 L.Ed.2d 694 (1989) (organization has representational standing to sue on member's behalf for reporting violations under CWA because they are unable to know the full extent of the pollution). ERF and Mateel therefore do not have "organizational" standing to sue.

PALCO contends that plaintiffs also do not have "associational" standing. Initially, PALCO argues that the Act's citizen-suit provision precludes "representative" suits brought by environmental organizations on behalf of members who have suffered a cognizable injury. Under the CWA, "any citizen" may commence a civil suit "on his own behalf" against any person "who is alleged to be in violation" of an effluent standard or limitation under the Act. 33 U.S.C. § 1365(a). A "citizen" is defined to be "a person or persons having an interest which is or may be adversely affected" by the defendant's violation of the Act. 33 U.S.C. § 1365(g).

Taking its cue from footnote six in the *Steel Co.* opinion, PALCO argues that the "plain language" of section 1365(a) permits an association to bring a suit under the CWA only for injuries that the association has suffered, i.e. organizational standing, rather than as a representative of its members. In *Steel Co.,* the Supreme Court addressed the question of whether an environmental group had standing to bring an action under the Emergency Community Planning and Right–to–Know Act of 1986 ("ECPRA"), 42 U.S.C. § 11046(a) and (c), against a steel company for failure to file timely hazardous chemical storage and emission reports. *Steel Co.,* 523 U.S. 83, 118 S.Ct. at 1008. In addressing the defendant's standing arguments, the Supreme Court noted *in dictum* that "it is arguable" that the citizen-suit provision of the ECPRA, 42 U.S.C. § 11046(a)(1), which allows "any person" to "commence a civil action on his own behalf" and which defines "person" to include associations, 42 U.S.C. § 11049(7), "permits respondent to vindicate only its own interests as an organization, and not the interests of its individual members." *Steel Co.,* 523 U.S. 83, 118 S.Ct. at 1018 n. 6. The Supreme Court, however, simply assumed that the environmental organization could sue on the basis of the interests of its individual members. *Id.*

In relying on the *Steel Co.* footnote, PALCO reasserts an identical argument raised in the context of a similar citizen-suit provision of the Endangered Species Act ("ESA"), 16 U.S.C. § 1540(g). *See Coho Salmon v. Pacific Lumber Co.,* 30 F.Supp.2d 1231, 1239–41 (N.D.Cal.1998). In *Coho Salmon,* the court looked to Supreme Court precedent regarding the nature of associational standing and noted that "[t]he doctrine of associational standing recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others." *Id.* at 1240 (quoting *Automobile Workers v. Brock,* 477 U.S. 274, 290, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986)). In doing so, the court determined that in the context of the ESA citizen-suit provision

> the association, in representing the interests of its members, stands in its members' stead rather than asserting the generalized interests of a third party unconnected to the association. As such, the phrase 'on his own behalf' in [16 U.S.C.] section 1540(g) does not limit the ability of an environmental organization to represent the interests of its members.

*Id.* The court therefore permitted the plaintiff environmental organizations to invoke the jurisdiction of the court after ascertaining that their members had standing to sue on their own. *Id.* at 1241–43.

The court need not undertake as comprehensive a review of the nature of associational standing in connection with the Clean Water Act's citizen-suit provision. Neither the case law nor the legislative history of the Act support PALCO's argument. In *Sierra Club v. Aluminum Co. of America ("ALCOA "),* 585 F.Supp. 842, 845 (N.D.N.Y.1984), the court considered an identical argument regarding the Act's citizen-suit provision and concluded that organizations are permitted to maintain suits under section 1365(g) even though the suits were not brought by an individual plaintiff or organization "on its own behalf." In doing so, the court stated:

> There is simply no support for defendant's position that the inclusion in section 505 of the words "on his own behalf" precludes citizen suits by representative organizations. While defendant correctly notes that there is a presumption against construing a statute as containing superfluous or meaningless words, *see United States v. Blasius,* 397 F.2d 203, 207 n. 9 (2d Cir.1968), *cert. dismissed,* 393 U.S. 1008, 89 S.Ct. 615, 21 L.Ed.2d 557 (1969), this Court concludes that the phrase "on his own behalf" is not mere surplusage but rather was intended only to exclude class action suits.

*Id.* at 847–48 (citing *Brown v. Ruckelshaus,* 364 F.Supp. 258, 265 (C.D.Cal.1973) and *City of Philadelphia v. Stepan Chemical Co.,* 544 F.Supp. 1135, 1146 (E.D.Pa. 1982)); *Sierra Club v. SCM Corp.,* 747 F.2d 99, 104 (2d Cir.1984) (organizations may establish standing under section 1365(g) by showing actual, concrete injury to organization or one or more of its members).

PALCO urges this court not to follow *ALCOA* because, it argues, *ALCOA*'s conclusion that the phrase "on his own behalf" was intended only to exclude class action suits under the CWA was rejected by the court in *Conservation Law Foundation of New England, Inc. v. Browner,* 840 F.Supp. 171, 176 (D.Mass.1993). PALCO misinterprets the holding in *Conservation Law.* The *Conservation Law* court, in fact, noted that Congress "clearly states" that the Act's citizen-suit provision does not authorize a class action. *Id.* at 175. Nonetheless, the court held that the "on his own behalf" phrase "theoretically" did not bar all class action suits brought under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9659, because under the CERCLA savings clause, 42 U.S.C. § 9659(h), the plaintiffs retained their right to bring a class action suit under the Federal Rules of Civil Procedure. *Id.* at 177–78 & n. 11. The court, however, did not address whether the phrase "on his own behalf" excluded the sort of associational standing asserted in the instant action. Even if *Conservation Law* presents a correct interpretation of the availability of the class action in the many similar citizen-suit provisions found in federal environmental statutes, it lends no support to PALCO's contention that plaintiffs cannot assert representational standing in this action.

The legislative history of the Act further confirms that Congress intended that "the definition of the term 'citizen' reflect[ed]

the decision of the Supreme Court in *Sierra Club v. Morton."* Conf.Rept. No. 92–1236, 92nd Cong., 2nd Sess. (1972), reprinted in, 1972 U.S.C.C.A.N. 3668, 3776, 3823 (1972); *Ohio ex rel. Brown v. Callaway,* 497 F.2d 1235, 1242 (6th Cir.1974) (right to intervene as plaintiffs under Fed. R.Civ.P. 24(a)(1) granted to organizations pursuant to section 505 of the Act since complaint alleged that members would suffer injury); *SCM Corp.,* 747 F.2d at 104–07 (legislative history leads to conclusion that "citizen" includes "those who can claim injury in fact within the meaning of *Morton "*). In *Morton,* the Court recognized that an environmental organization could bring suit under section 10 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, on behalf of its members as long as those members had suffered an injury in fact.[2] *Morton,* 405 U.S. at 739, 92 S.Ct. 1361 ("It is clear that an organization whose members are injured may represent those members in a proceeding for judicial review"). The Court nonetheless held that the Sierra Club did not have standing to challenge the proposed construction of recreational facilities in a quasi-wilderness park because it failed to allege that its members had suffered an injury in fact. In doing so, the Court held that "a mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem," is not sufficient for the organization to be "adversely affected" within the meaning of the APA. *Id.* The *Morton* Court therefore clearly contemplated that organizations had standing to sue on behalf of its members if their members could establish standing to sue.

In light of the Act's legislative history and case law, the phrase "on his own behalf" does not limit the ability of an environmental organization to represent the interests of its members under the citizen-suit provisions of the CWA. Such an inter-

---

**2.** Section 10 of the APA provides that:
A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the mean-

ing of a relevant statute, is entitled to judicial review thereof.
5 U.S.C. § 702.

pretation of the legislative history and the Act is in keeping with the determination of numerous courts which have allowed CWA suits brought by environmental organizations on their members' behalf. *Cf. Friends of the Earth, Inc. v. Crown Central Petroleum Corp.*, 95 F.3d 358, 359 (5th Cir.1996) (considering associational standing under citizen-suit provision of CWA); *Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 69 (3rd Cir.1990), *cert. denied*, 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991).

In order to establish associational standing, plaintiffs must point to disputed factual issues establishing that (1) their members would have standing to sue on their own; (2) the interests they seek to protect are germane to their purpose, and (3) their claim and requested relief do not require participation by individual members. *Hunt*, 432 U.S. at 343, 97 S.Ct. 2434. PALCO neither challenges whether Mateel and ERF seek to protect interests that are germane to their purpose or whether this action requires the participation of any of the plaintiffs' individual members. Rather, PALCO only questions whether ERF and Mateel have pointed to sufficient facts to establish that their members have standing to sue on their own behalf. In contrast, plaintiffs assert that their submissions clearly show that plaintiffs have established that PALCO's discharges have affected plaintiffs' members in a personalized and individual manner. *Cf. Powell Duffryn*, 913 F.2d at 72 (plaintiff not required to show with scientific certainty that defendant's discharges caused injury); *CBE–Calif.*, 996 F.Supp. at 937 (standing to sue based on members' declarations of injury to personal enjoyment of San Francisco Bay due to defendant's pollutant discharges). Again, the court does not reach either the causation or redressability prongs of the standing analysis because it finds that plaintiffs have failed to provide sufficient facts to establish that their members have suffered an injury in fact.

The injury in fact requirement is designed to limit access to the courts to those "who have a direct stake in the outcome" of the litigation. *Morton*, 405 U.S. at 740, 92 S.Ct. 1361. To establish that their members have suffered a cognizable injury in fact, plaintiffs must point to "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Defenders of Wildlife*, 504 U.S. at 560, 112 S.Ct. 2130. The injury in fact test specifically requires both an injury to a cognizable interest and that the party seeking review be affected in a "personal and individual way." *Id.* at 561 & n. 2, 112 S.Ct. 2130; *Morton*, 405 U.S. at 734–735, 92 S.Ct. 1361. An injury to the aesthetic, environmental, or recreational interests of one or more of the plaintiff organizations' members may be sufficient to satisfy the injury in fact requirement of standing. *See Morton*, 405 U.S. at 734, 92 S.Ct. 1361; *Friends of the Earth v. Consolidated Rail Corp.*, 768 F.2d 57, 61 (2d Cir.1985) (quoting *SCM Corp.*, 747 F.2d at 107). In determining whether the alleged injury to aesthetic, environmental or recreational interests is sufficient to confer standing, courts have stressed that "these injuries need not be large, an identifiable trifle will suffice." *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.*, 73 F.3d 546, 557 & n. 23 (5th Cir.1996) (citation omitted); *Powell Duffryn*, 913 F.2d at 71; *Save Our Community v. U.S. E.P.A.*, 971 F.2d 1155, 1161 (5th Cir.1992) (listing cases recognizing "low threshold for sufficiency of injury").

PALCO's argument that plaintiffs have failed to satisfy the injury in fact requirement entails two considerations: first, PALCO maintains that plaintiffs "must prove harm" to Yager Creek and establish that this harm has injured their members; and, second, PALCO asserts that plaintiffs have failed to establish that their members have a sufficient temporal or spatial connection to the Yager Creek region. PALCO initially argues that plaintiffs have failed to satisfy the injury in fact prong

despite their assertions of harm because plaintiffs' members have not monitored Yager Creek for the presence of pollutants and increased levels of turbidity and sedimentation and have therefore failed to prove harm to the creek. It further contends that a disputed issue of fact exists as to whether PALCO's alleged discharges pose an actual and imminent threat of harm or injury to plaintiffs' members to the extent and in the manner they assert. In doing so, PALCO provides declarations from its experts stating that the evidence presented is insufficient to prove that its discharges have "harmed" Yager Creek or that any wrongful discharges have even occurred. For instance, Richard Azevedo, Associate Water Resource Control Engineer for the RWQCB, states that data gathered at PALCO's facilities does not conclusively establish PALCO's discharges harmed Yager Creek. D's Exhs., Exh. B [Azevedo Decl.], at ¶¶ 3–7; *see also* D's Exhs., Exh. D [Job Decl.] at ¶ 7–8. PALCO's toxicology expert, James W. Embree, further states that the levels of PCP to which plaintiffs' members have been exposed, either by recreating in Yager Creek, drinking its water, or ingesting fish residing in Yager Creek is inadequate to support claims of adverse health effects. D's Exhs., Exh. E [Embree Decl.] at ¶¶ 8–9, 11. Similarly, John Prevost, PALCO's Director of Environmental Services, states that PALCO has been complying with all general permit conditions at Yager Camp since November 8, 1996, and has brought its Carlotta mill operations into compliance as of April 29, 1997. *See* D's Exhs., Exh. A [Prevost Decl.], at ¶¶ 10 and 22.

In support of its argument, PALCO relies heavily on the Third Circuit's determination in *Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc.* ("*Magnesium* "), 123 F.3d 111, 121–25 (3rd Cir.1997), that the finding of the trial court at the conclusion of the penalty phase of the action that defendant's violation of an effluent standard did not cause harm or threaten any injury to the waterway into which it discharged pollutants compelled the conclusion that plaintiff's members who used the waterway for recreational purposes lacked standing to sue for CWA emissions and reporting violations. It noted that "absent a showing of actual, tangible injury to the River or its immediate surrounding, PIRG's members are no less 'concerned bystanders' than any other citizen who takes an interest in our environment." *Id.* at 121. "Significantly," the court noted, the plaintiff had failed to cite "any increases in the River's salinity, or a decrease in the number of fish, or any other negative change in the River's ecosystem," but rather, had only shown that they reduced certain recreational activities. *Id.* As such, the court held that the plaintiff-members' allegations of injury were distinguishable from those cases where the plaintiffs complained of "the brown color and the bad odor" of the water, *see Powell Duffryn*, 913 F.2d at 71, or where plaintiffs have observed an "oily sheen" and "unpleasant smell," *see Texaco Refining*, 2 F.3d at 505. *See Magnesium*, 123 F.3d at 121. Finally, the court held that "the reduction in a person's recreational activity cannot support the injury prong of standing" where a court determines on the merits that the "polluter's violation of an effluent standard has not harmed the affected waterway." *Id.*

Similarly, in *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,* 179 F.3d 107, 113 (4th Cir.1999), the Fourth Circuit in a split decision recognized that harm to the aesthetic, environmental or recreational interests of the plaintiff environmental organization's members were legally protected interests under the CWA. However, the court determined from the testimony adduced at trial that plaintiffs failed to establish that the waters in which plaintiffs' members recreated or used were "actually, or in imminent threat of being, adversely affected by pollution." *Id.* In particular, the court noted that plaintiffs failed to provide evidence showing that the lakes or streams used by plaintiffs' members were "in fact" adversely affected by pollution (1) by performing a "toxicity test, or tests or studies of any kind" or (2) by

testifying to "an observable negative impact on the waters that they used or the surrounding ecosystem of such water." *Id.* at 113–14. As a result, "without any evidence to support their fears or establish the presence of pollutants in the allegedly affected waters," the court held that the testimony of plaintiffs' members at most amounted to a "concern" tantamount to "mere speculation" as to the presence of pollution. *Id.*

The court, however, refuses to adopt the approach advocated by PALCO or taken by the Third Circuit in *Magnesium* and the Fourth Circuit in *Gaston*. First, both *Gaston* and *Magnesium* merit less weight at the summary judgment stage because those courts relied on the lower court's determination on the merits that the polluter's discharge did not cause any harm to the river at issue. *See Waste Action Project v. Atlas Foundry & Machine Co.,* 1998 WL 210846, *3 (W.D.Wash., March 5, 1998). In contrast, the parties in the instant action raise the issue of standing in the context of cross-motions for summary judgment. Secondly, the court notes with approval the dissent in *Gaston* which recognized that the majority had constructed a virtually insurmountable standing hurdle for CWA or other environmental citizen suit plaintiffs. *Gaston,* 179 F.3d at 117 (Wilkinson, J., dissenting). In reviewing the declarations provided by plaintiffs in support of standing, the dissent recognized that the plaintiff environmental organization's affiant was a "real person who owns a real home and lake" just four miles from defendant's pollutant discharge site, not a "roving ombudsman seeking to right environmental wrongs." *Id.* at 117. Plaintiff was therefore trying to enforce concrete and "legitimate health and environmental concerns," and not some "speculative" injury. *See Defenders of Wildlife,* 504 U.S. at 564–65 n. 2, 112 S.Ct. 2130. In his dissent, Judge Wilkinson further pointed out several failings in the majority's approach. *Id.* at 117–18 (noting various "practical drawbacks"). Particularly troubling about the majority's approach—and PALCO's contention—is the conflation of the Article III

standing analysis and, as Judge Wilkinson puts it, the "merits question" of whether the defendant in *Gaston* violated the CWA by exceeding discharge limitations. *Id.* at 118. In pointing out this weakness in the approach taken by the *Gaston* majority, Judge Wilkinson noted that the standing analysis will "assume a complicated life of their own," resulting in a "battle of the experts" to determine the requisite concentration of a dissolved chemical which causes an "observable negative impact" on the waterway at issue or physical or other injury to an organization plaintiff's members. *Id.* at 117–18.

At root, PALCO's position does not reflect the general consensus of the courts regarding standing jurisprudence for plaintiff's seeking to enforce the requirements of the CWA. *Cf. Waste Action Project,* 1998 WL 210846 at *2– 3 (rejecting defendant's argument that environmental organization had not established that pollutant discharges "caused harm" because it had not conducted any scientific tests to determine whether the pollutants discharged by the defendant "actually detracts from the water quality" of the waterway). For example, in *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.,* 73 F.3d 546, 556 (5th Cir.1996), the Fifth Circuit held that affidavits provided by plaintiff describing how its members used the bay at issue for various recreational activities were sufficient to satisfy the injury in fact requirement. Each affiant made the statement, "I am concerned that the discharge of produced water adversely affects the water quality and the wildlife of the bay. Therefore, I am concerned that the continued discharge of produced water will impair my ability to enjoy the activities in which I participate"; only one affiant testified that he had participated in activities in the vicinity of defendant's point of discharge. *Id.* at 556. However, none of the affiants attested that the "produced water" released by defendant "in particular" had impaired or threatened to impair his use of the bay. *Id.* The court rejected the defendant's contention that the affidavits amounted only

to a mere concern or belief that the discharges would impair their ability to engage in recreational activities, rather than an "actual" injury in fact. "Whether the affiants were 'concerned' or 'believed' or 'knew to a moral certainty' that produced water would adversely affect their activities on the bay is a semantic distinction that makes little difference in the standing analysis." *Id.* Rather, by expressing fear that the pollutant discharges would impair their enjoyment of recreational activities in the bay because the activities "are dependent on good water quality," the plaintiff's affiants established a "direct stake" in the outcome of the litigation. *Id.*

Similarly, in *Friends of the Earth v. Consolidated Rail Corp.,* 768 F.2d 57, 61 (2d Cir.1985), the Second Circuit found on the basis of two individual affidavits submitted by the plaintiff environmental organization that the injury in fact requirement was "adequately satisfied." One affiant stated that he passed the waterway at issue "regularly" and found "the pollution in the river offensive to his aesthetic values"; the second affiant averred that his "children swim in the river, his son occasionally fishes in the river and his family has and will continue to picnic along the river." *Id.* In *Sierra Club v. Simkins Indus., Inc.,* 847 F.2d 1109, 1112 n. 3 & 1113 (4th Cir.1988), the Fourth Circuit determined that the Sierra Club had satisfactorily established injury and the threat of future injury where a single group member attested that he "regularly" hiked

along the river at issue and had been adversely affected by the "odorous and unsightly illegal pollution." Also, in *United States v. Metropolitan St. Louis Sewer Dist.,* 883 F.2d 54, 56 (8th Cir.1989), the Eighth Circuit determined that the intervenor environmental organizations had satisfied the injury in fact requirement where "two of its named members" alleged that "many of the 25,000 members [of the environmental organization] visit, cross, and frequently observe the bodies of water identified ... and that from time to time these members use these waters for recreational purposes." Lastly, in *Save Our Community,* the court determined that the plaintiff environmental organization had sufficiently supported its claim of standing with affidavits stating that is members "resided in the vicinity of or owned property near the wetlands [at issue], and enjoyed 'the wildlife, aesthetics, open space, ecological and other values of the wetlands.'" *Save Our Community,* 971 F.2d at 1160–61.

As previous CWA plaintiffs have done in many of the above cited cases, plaintiffs in this action have submitted the declarations of Douglas Fir, Chris Hinderyckx, William Verick, and Frederic Evenson, all members of either Mateel or ERF, in support of their contention that their members have suffered a concrete and particularized injury as a result of PALCO's activities at its facilities. Each attests to the use and enjoyment of the creeks and rivers near both Yager Camp and Carlotta mill.[3]

---

**3.** For example, Evenson, a director of ERF, states that since his move to Humboldt County in 1995 he has visited Yager Creek on seven occasions, during which he has waded or swum in the creek Three of the Evenson's visits occurred between 1990 and 1995, two visits were in connection with rallies held at Yager Creek to express concern for the Headwaters forest, and two visits occurred after the initiation of this lawsuit. Evenson Decl., at ¶¶ 2, 4, 6 and 8; D's Exhs., Exh. C–3 [Evenson Dep.] at 16, 44.

Verick, a member of Mateel, has visited Yager on six occasions since the fall of 1995. On his first visit, Verick observed the creek from the Highway 36 bridge because he "was

interested to see what it, and its surrounding environment, looked like." Verick Decl., at ¶ 3. He subsequently visited the creek as part of the Headwaters demonstration attended by Evenson during which he observed the creek bed. *Id.* at ¶ 4. He has since visited Yager Creek on four occasions, once as an "inspection" of PALCO's facilities and on three times after the initiation of this lawsuit. Plaintiffs state that the "turbid nature of the water and the likely presence of toxic chemicals in it decreased the enjoyment Mr. Verick gets from drinking water drawn from Yager Creek." D's Exhs., Exh. C–9 [Mateel Interrogatory Answ.] at ¶ 21. Verick makes no representations regarding his intentions to visit Yager Creek in the future.

With the exception of Verick, each of these members also states that he has specific plans to return to Yager Creek in the near future to use it for recreational or aesthetic purposes. *See, e.g.,* Fir Decl., at ¶ 14. Finally, each member also testifies that he fears exposure to contaminants discharged from Carlotta mill and Yager Camp while swimming and wading in or drinking water from Yager Creek and that his enjoyment and use of the creek and its environment has been impaired by increased silt and sedimentation as a result of PALCO's activities.[4] *See, e.g.,* D's Exhs., Exh. C–3 at 11, 16–18 and Exh. C–4 at 29–31; Fir Decl. at ¶ 6 and 10. Finally, plaintiffs submit several expert declarations providing scientific evidence to establish that the increased sedimentation and discharges of other pollutants can cause deleterious effects on both aquatic species and humans at the appropriate levels of exposure.[5]

Despite the low threshold required for satisfying the injury in fact requirement, the court does not find that plaintiffs' submissions regarding harm to their members and their members' connection to Yager Creek to be adequate. PALCO has provided no reason for the court to doubt the veracity of the affiants' statements, and the court does not do so. However, even in view of the statements of plaintiffs' members construed in a light most favorable to plaintiffs, the court finds that the members' spatial and temporal contacts with Yager Creek are too sporadic or attenuated to satisfy the injury in fact prong of the standing analysis. Importantly, none of plaintiffs' affiants state that they live in the vicinity of Yager Creek or regularly use Yager Creek for recreational or aesthetic purposes. With the exception of Hinderyckx, plaintiffs' members' sporadic use of Yager Creek either occurred in the distant past or has been primarily in connection with inspections of PALCO facilities in preparation for this lawsuit or during Headwaters demonstrations at which they "noticed" the condition of the creek. As such, these members appear to be no more than the "roving ombudsmen" to which Judge Wilkinson referred in his dissent in *Gaston.*

Fir, who became a member of Mateel in January of 1997, has visited Yager Creek in the vicinity of the Carlotta mill and Yager Camp facility on ten separate occasions. Fir Decl., at ¶¶ 6–14. However, three of these visits occurred long before PALCO's ownership of the lumber facilities at issue here. Two of these visits were in connection with Headwaters demonstrations, another was with Verick on his "inspection" of PALCO's facilities, and the rest occurred after the initiation of this lawsuit. *See* First Amdd.Compl., at ¶ 33 (Mateel and ERF "investigators" visited Carlotta mill in November 1996 and January 1997). With the exception of his inspection visit, Fir used the creek for recreational and aesthetic purposes. *Id.* at ¶¶ 8–13.

4. PALCO somewhat speciously argues that plaintiffs' members were never unable to use Yager Creek and Van Duzen River for recreation or otherwise despite the alleged discharge of contaminants from PALCO's facilities. Although it is true that plaintiffs' members could have used the waterways downstream from Yager Camp and Carlotta mill, they would have had to disregard the threat of injury resulting from the discharge of pollutants to do so.

5. For example, plaintiffs' expert John Williams concludes from the listing of Yager Creek and the Van Duzen River by the SWRCB and EPA as an "impaired water body due to sedimentation" that the introduction of fine-grained sediment discharged into Yager Creek by PALCO will adversely affect beneficial uses of the stream. Williams Decl., at ¶¶ 4, 7 & Exhs. A, B. It is further undisputed that laboratory tests on several samples of discharges taken from the Carlotta mill have shown varying amounts of toluene, pentachlorophenol and motor oil. Jt. Stmt. of Undisp. Facts, at ¶¶ 75–79 (January 31, 1997 sawmill/planer sump sample laboratory test showing substantial amounts of PCP, motor oil and toluene); at ¶¶ 80–81 (lab tests on October 14, 1997, samples from MW–3 and MW–4 showing amounts of PCP, benzene, and gasoline). Plaintiffs' expert, Marc Lappé, further states that downstream aquatic organisms will suffer adverse effects from ingesting pentachlorophenol found in the contaminated discharges from Yager Camp and Carlotta mill. Lappé Decl. in Opp., at ¶¶ 8–19

Among these affiants, only Hinderyckx, a member of Mateel, states that he has used Yager Creek for aesthetic and recreational purposes on several occasions separate from this lawsuit or the Headwaters demonstrations. *See* D's Exhs., Exh. C–4 [Hinderyckx Dep.] at 9–10 (between 1989 until now he has swum in Yager Creek up to a dozen times); Jt. Stmt. of Undisp. Facts, at ¶¶ 47–48. As such, the court must determine whether Hinderyckx' visits to Yager Creek are of sufficient quality to satisfy the Article III injury in fact requirement and to confer standing upon Mateel. Although *Morton* and other courts have noted that injury suffered by a single member of a plaintiff organization is sufficient to confer associational standing, these courts have clearly held in cases involving only one member-affiant that the affiant have some *regular* or *continuous* connection with the waterway at issue, such as a residence in close proximity to the waterway or some other regular, frequent contact with the waterway. *See Sierra Club, Lone Star*, 73 F.3d at 557 n. 23 (listing CWA cases in which single affiant has "regular" contact with waterway); *Simkins Indus.*, 847 F.2d at 1112 n. 3 & 1113; *Consolidated Rail*, 768 F.2d at 61; *compare Metropolitan St. Louis Sewer*, 883 F.2d at 56 (many of 25,000 members of organization "from time to time" use waterway). In contrast, in the instant action, Hinderyckx has visited Yager Creek only up to a dozen times over the course of about 8 years, during which he has used the creek for aesthetic or recreational purposes. He further does not assert that he lives in the vicinity of Yager Creek or regularly visits any areas in close proximity to Yager Creek. Plaintiffs have pointed to no Ninth Circuit precedent holding that such sporadic or infrequent visits to a waterway by a single member-affiant of a plaintiff organization in an action to enforce CWA provisions can confer standing on the organization. Absent such direction and on the limited facts of this case, the court is unwilling to find that Hinderyckx' sporadic usage of or connection to Yager Creek is of the requisite frequency needed to confer standing upon an organization seeking to represent an individual member's interests.

As such, the court grants defendant's motion for summary judgment on the issue of standing and denies plaintiffs' motion for summary judgment on the issue of standing. Because the court finds that plaintiffs do not have standing to pursue this action, the court does not reach the issues of mootness and the propriety of plaintiffs' sixty-day notices of intent to sue, or plaintiffs' motion for summary judgment on the merits of their CWA claims.

*CONCLUSION*

The court hereby GRANTS defendant's motion for summary judgment on the threshold jurisdictional issue of standing and DENIES plaintiffs' motion for summary judgment on the issue of standing. This order fully adjudicates the motions reflected at Docket # 40 and # 46 and the Clerk of the Court shall remove it from the pending motions list.

IT IS SO ORDERED.